MISSOURIANS AGAINST HUMAN CLONING, et al., Appellants,

v.

Robin CARNAHAN, Secretary of State, et al., Respondents.

Nos. WD 66495, WD 66496.

Missouri Court of Appeals, Western District.

March 28, 2006.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 25, 2006.

Application for Transfer Denied May 11, 2006.

Kevin Hayden Theriot, David Christopher LaPlante, Joel L. Oster, James M. Jenkins, Leawood, KS, Stephen Gilbert Sanders, Kansas City, for Appellants, Missourians Against Human Cloning, David W. Mason, Sarah E. Mason, William P. Biermann, Tammy Coleman, Mary S. Weber.

Lawrence Alan Weber, Jefferson City, Bernard C. Huger, Lucie Furstenber Huger, St. Louis, Kevin Francis Hormuth, St. Louis, for Appellants, Bishops Robert Finn, John Gaydos, Raymond Burke, Robert Hermann, John Leibrecht, Raymond Boland.

Jeremiah W. (Jay) Nixon, Atty. Gen., Karen King Mitchell, Deputy Atty. Gen., Heidi Christine Doerhoff, Daniel Y. Hall, Asst. Attys. Gen., Jefferson City, for Respondent Secretary of State, Robin Carnahan.

Ann Kettering Covington, St. Louis, David A. Welte, Cathy Joy Pitman Dean, Kansas City, for Respondent John Danforth.

George Alex Bartlett, Charles William Hatfield, Jefferson City, for Thomas Eagleton and Donn Rubin.

James Bernard Deutsch, Jefferson City, for Jeffrey McCaffrey and Cynthia Kramer.

The cause was argued by Joel L. Oster for appellants MAHC, by Kevin Hormuth for the intervenor Bishops, and by Karen King Mitchell for Respondent Secretary of State.

Before SMART, P.J., and HOWARD and HOLLIGER, JJ.

VICTOR C. HOWARD, Judge.

Missourians Against Human Cloning, et al., appeal the circuit court's order approving the Secretary of State's summary statement portion of the certified ballot title for the "Missouri Stem Cell Research and Cures Initiative." Appellants' sole point on appeal[1] contends that the certified title is "insufficient or unfair," in contravention of Mo.Rev.Stat. section 116.190.[2] Affirmed.

**Facts and Procedural Background**

The "Missouri Stem Cell Research and Cures Initiative" proposes to amend the Missouri Constitution by citizens' initiative, as provided in Chapter 116 of the Missouri Revised Statutes. Appellants comprise a number of Missouri citizens and a non-profit organization. The respondents are Secretary of State Robin Carnahan, a re-

---

1. Multiple appellants and respondents have filed multiple briefs in this case. Appellants' arguments are almost, but not quite, in unison. We will address all of appellants' claims together.

2. All statutory citations are to Mo.Rev.Stat. (Cum.Supp.2005) unless otherwise noted.

quired defendant, and a number of Missouri citizens that the trial court allowed to intervene as additional defendants.

The initiative would permit researchers in Missouri to conduct any stem cell research allowed by federal law. Stem cell research is research on cells that have the ability to divide multiple times and produce specialized cells in the body. In paragraph two, the initiative states that its purpose is:

> To ensure that Missouri patients have access to stem cell therapies and cures, that Missouri researchers can conduct stem cell research in the state, and that all such research is conducted safely and ethically, any stem cell research permitted under federal law may be conducted in Missouri, and any stem cell therapies and cures permitted under federal law may be provided to patients in Missouri, subject to the requirements of federal law and only the following additional limitations and requirements[.]

This appeal focuses on one of the initiative's proposed limitations and restrictions on stem cell research. Central to the controversy is the initiative's restriction that "[n]o person may clone or attempt to clone a human being." The initiative defines human cloning as causing or attempting to cause the birth of a human being by implanting in a uterus anything other than the product of fertilization of a human egg by a human sperm. Appellants disagree with this definition because human cloning, they argue, actually occurs when a body cell and an egg are fused together during a process known as somatic cell nuclear transfer (SCNT). SCNT, which appellants consider cloning, is a process used in stem cell research and is currently permitted by federal law. A human cell produced by SCNT can be used for two purposes:

biomedical research or, theoretically, to produce a human child, although the latter has never been attempted. Appellants argue that, while the initiative does ban human cloning to produce a child, it would still allow SCNT to perform research which they also consider human cloning. Therefore, appellants claim, the ballot title's statement that the initiative would "ban human cloning or attempted cloning" is deceptive.

It is the responsibility of the Secretary of State to certify the official ballot title of an initiative. § 116.180. The ballot title consists of two parts: a summary statement and a fiscal note summary. § 116.010(4).[3] After initiative proponents submit a proposed petition and the Secretary of State and Attorney General approve it as to form, § 116.332, the Secretary of State prepares a summary statement of the initiative not to exceed 100 words, § 116.334. The summary "shall be in the form of a question using language neither intentionally argumentative nor likely to create prejudice either for or against the proposed measure." *Id.* This summary statement must be affixed to each page of the petition before being circulated for signatures. § 116.180.

On November 14, 2005, the Secretary of State certified the official ballot title, including the summary statement, challenged by appellants. The complete language of the summary reads as follows:

> Shall the Missouri Constitution be amended to allow and set limitations on stem cell research, therapies, and cures which will:
>
> > ensure Missouri patients have access to any therapies and cures, and allow Missouri researchers to conduct any research, permitted under federal law;

---

**3.** The fiscal note summary portion of the bal-
lot title is not contested in this case.

ban human cloning or attempted cloning;

require expert medical and public oversight and annual reports on the nature and purpose of stem cell research;

impose criminal and civil penalties for any violations; and

prohibit state or local governments from preventing or discouraging lawful stem cell research, therapies and cures?

Specifically, appellants challenge the summary's statement that the initiative would "ban human cloning or attempted cloning." They contend this summary language is unfair and/or insufficient, in violation of section 116.190, because, while the initiative does ban "cloning to produce children," it permits the process of SCNT which, appellants claim, constitutes "human cloning."[4] Appellants ask us to either certify an alternative summary or reverse and remand, instructing the trial court to do so. Specifically, appellants ask us to replace the phrase "ban human cloning or attempted cloning" with either of the following pairs of phrases:

ban human cloning or attempted cloning *to produce children;* [but] *allow human cloning for biomedical research*

or

ban *reproductive* human cloning or attempted *reproductive human* cloning; [but] *allow human therapeutic cloning or attempted human therapeutic cloning.*

(Emphasis added to indicate appellants' proposed added language.)

At the heart of the controversy is how the parties characterize the process of so-

matic cell nuclear transfer (SCNT), which is one of the methods used in stem cell research that the initiative would constitutionally protect. The parties' differences are clearly defined when projected against the backdrop of the basic science of SCNT.

SCNT occurs when the nucleus of an unfertilized egg (an oocyte) is removed (enucleated) and replaced with the nucleus of an ordinary body cell (a somatic cell). A somatic cell is any body cell other than a sperm or an egg, for example, a skin cell. The product of this fusion (a zygote) is a single cell that contains the 46 chromosomes of the body cell donor. With stimulation by electrical current or an ionic solution, the zygote can be coaxed to begin a series of divisions called cleavage. After three or four days, the zygote has divided into approximately eight or ten cells and is called the morula. This cell division continues, and on the fourth or fifth day, the result is a ball of about 150 cells called a blastocyst, a very small cluster of cells approximately 1/200 of an inch in diameter. The blastocyst has an outer cell layer and a hollow, fluid filled, inner cavity containing undifferentiated stem cells. Undifferentiated stem cells are cells that have not yet committed to which specific type of body cell they will mature into, for example, a skin, heart, or brain cell. Scientists hope to extract these four- to six-day-old inner stem cells and employ this potential to mature into virtually any type of body cell to provide a repair system for the treatment of a wide variety of illnesses like Parkinson's or diabetes. It is also at this stage of development that a blastocyst produced through SCNT could theoretically be implanted into a womb resulting in the birth of a human being, although the con-

---

4. The initiative is also applicable to stem cell research other than that involving SCNT, for example, work with adult stem cells that are undifferentiated cells found in body tissue, such as an umbilical cord, or research using blastocysts left over from fertility treatments utilizing in vitro fertilization.

stitutional initiative would specifically ban such a procedure in Missouri.

Appellants' position is that, at the moment when a human somatic cell and a human enucleated egg are fused, human cloning occurs because the resulting zygote is, appellants argue, a human embryo at the one-celled stage of human development with genetic information that is virtually identical to the body cell donor. Appellants argue that upon completion of this event, fusion of an egg and a somatic cell, human cloning has occurred and the resulting cell can then be utilized for one of two purposes. If a zygote were to be developed into a blastocyst and implanted into a uterus, appellants describe this as "reproductive cloning" or "cloning to produce children." If the inner stem cells of the blastocyst are extracted for research or treatment, appellants consider this "cloning for biomedical research" or "therapeutic cloning." Use of SCNT for either purpose, according to appellants, involves human cloning.

Appellants' position is in obvious conflict with the definition of human cloning contained in the initiative which states that human cloning "means to implant or attempt to implant in a uterus anything other than the product of fertilization of an egg of a human female by a sperm of a human male for the purpose of initiating a pregnancy that could result in the creation of a human fetus or the birth of a human being." Respondents defend this definition because, they say, a blastocyst is scientifically defined as an embryo only from the time it is implanted in a uterus until the end of the eighth week, when it becomes known as a fetus. They argue that the cloning of a human being is not the production of a single cell in a petri dish. Instead, producing a "human clone" would be defined as the creation of a complete born human. Respondents further assert

that SCNT only involves cells from a blastocyst, never cells from an embryo or fetus, as those terms are scientifically defined. Also, they say, a blastocyst left in a petri dish would never develop into an embryo or a human child.

The parties' differences are stark. According to appellants, human cloning occurs upon the transfer of a body cell's nucleus into an enucleated egg. According to respondents, and the initiative language, human cloning occurs only where SCNT is used in the attempt to cause the birth of a human being, in other words, to create a human version of the much-publicized Dolly the sheep. Both sides introduced evidence to support their definition of human cloning. However, for reasons we later explain, it is not necessary for us to resolve this definitional disagreement in the context of this ballot title challenge.

Appellants challenged the ballot title in the circuit court of Cole County. The trial court heard evidence and arguments and found that the appellants did not sustain their burden to establish that the summary statement portion of the ballot title was insufficient or unfair as those terms are used in section 116.190 and denied relief. This appeal followed.

## Standard of Review

In a court-tried case, we will sustain the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); *Hancock v. Sec'y of State*, 885 S.W.2d 42, 46 (Mo.App. W.D.1994).

## Discussion

Chapter 116 provides that "[a]ny citizen who wishes to challenge the official ballot title ... prepared for a proposed constitutional amendment ... by initiative petition

... may bring an action in the circuit court of Cole County." § 116.190.1. "The petition shall state the reason or reasons why the summary statement portion of the official ballot title is insufficient or unfair and shall request a different summary statement...." § 116.190.3. "[T]he court shall consider the petition, hear arguments, and in its decision certify the summary statement portion of the official ballot title to the secretary of state." § 116.190.4.

■ Our role is not to act as a political arbiter between opposing viewpoints in the initiative process:

> When courts are called upon to intervene in the initiative process, they must act with restraint, trepidation....
>
> ....
>
> Courts are understandably reluctant to become involved in pre-election debates over initiative proposals. Courts do not sit in judgment on the wisdom or folly of proposals.

*Missourians to Protect the Initiative Process v. Blunt,* 799 S.W.2d 824, 827 (Mo. banc 1990). "Before the people vote on an initiative, courts may consider only those threshold issues that affect the integrity of the election itself, and that are so clear as to constitute a matter of form." *United Gamefowl Breeders Ass'n of Mo. v. Nixon,* 19 S.W.3d 137, 139 (Mo. banc 2000).

■■ The burden is on the opponents of a summary statement to show that the language is "insufficient and unfair." *Hancock,* 885 S.W.2d at 49. We have previously defined "insufficient or unfair":

> Insufficient means "inadequate; especially lacking adequate power, capacity, or competence." The word "unfair" means to be "marked by injustice, partiality, or deception." Thus, the words insufficient and unfair ... mean to inadequately and with bias, prejudice, decep-

tion and/or favoritism state the [consequences of the initiative].

*Id.* (citations omitted). The purpose of the ballot title "is to give interested persons notice of the subject of a proposed [law] to prevent deception through use of misleading titles. If the title gives adequate notice, the requirement is satisfied." *Union Elec. Co. v. Kirkpatrick,* 606 S.W.2d 658, 660 (Mo. banc 1980).

■ Appellants argue that the summary is insufficient and unfair because it states that the initiative bans human cloning when, in fact, the initiative allows what they consider human cloning. Appellants' argument is not based on the contention that the summary is a mismatch with the language of the initiative; they conceded during oral argument that the summary's language is not inconsistent with the initiative. Appellants' real dispute seems not so much with the summary statement as it is with the initiative's definition of human cloning, a definition supported by evidence introduced at the hearing. While appellants may disagree with the initiative's definition of human cloning, that alone does not make the summary inaccurate. The summary states that the initiative bans human cloning and, in fact, by its very terms, the initiative does. The summary could be considered misleading only if we ignore the definition of human cloning actually set out in the initiative and substitute appellants' definition.

Appellants contend that their proposed substitute language would more clearly reflect the purpose of the initiative. Appellants' suggested language would revise the summary to state that the initiative would permit "human cloning" for "therapeutic" or "biomedical research" purposes. Respondents object to the substitute language arguing that the suggested language is vague, confusing, and would introduce undefined terms not commonly

used in the scientific community. We agree with respondents to the extent that adding language to indicate that the initiative does not ban human cloning would certainly be misleading because human cloning, as defined in the initiative, is banned. In effect, Appellants want us to revise the summary to highlight the underlying controversy surrounding the merits of the initiative. Resolution of that controversy must be left to the political process.

■■■■ Even if, as appellants argue, their substitute language would provide more specificity and accuracy in the summary statement "and even if that level of specificity might be preferable, whether the summary statement prepared by the Secretary of State is the best language for describing the [initiative] is not the test." *Bergman v. Mills*, 988 S.W.2d 84, 92 (Mo. App. W.D.1999); *Overfelt v. McCaskill*, 81 S.W.3d 732, 738 (Mo.App. W.D.2002). "The important test is whether the language fairly and impartially summarizes the purposes of the [initiative.]" *Bergman*, 988 S.W.2d at 92. Within the confines of the 100–word limit, the summary "need not set out the details of the proposal." *United Gamefowl Breeders Ass'n of Mo.*, 19 S.W.3d at 141.

Ultimately appellants ask us to choose their definition of human cloning over that set out in the initiative. We decline to choose between the two definitions. To do so would edge us toward a review of the merits of the initiative itself. That is beyond the scope of review we have been assigned by the legislature in section 116.190. There may well be a situation where an initiative's language and purpose are so absurd or unsupportable that merely summarizing the initiative without explanation would be deceptive and misleading. That is not our case.

One of the purposes of the initiative is to ban human cloning, a term it defines. The Secretary of State's summary states that the initiative would "ban human cloning or attempted cloning." The summary accurately describes what the initiative says it will do and gives voters sufficient and fair notice of the subject and purpose of the initiative. "While there may be aspects of the ballot initiative or consequences resulting therefrom that [a]ppellant[s] would have liked to have seen included in the summary statement, their exclusion does not render the summary statement either insufficient or unfair." *Overfelt*, 81 S.W.3d at 739.

The conclusion of the trial court that appellants did not sustain their burden of establishing that the summary statement of the official ballot title is either insufficient or unfair is not erroneous. The judgment is affirmed.

HOLLIGER, J., concurs.

SMART, J., concurs in part and dissents in part in separate opinion.

JAMES M. SMART, JR., Judge, concurring in part and dissenting in part.

The controversy in this case is about a phrase that has become a shibboleth of both sides of the debate about somatic cell nuclear transfer. Because of the frequent use of the phrase "human cloning" in inconsistent ways in the legal and political controversies about somatic cell nuclear transfer ("nuclear transfer" for convenience), the ballot summary, standing alone, does not provide sufficient reference or context to clarify the meaning of the phrase and will tend to mislead those who are philosophically opposed to all nuclear transfer. Accordingly, I regard the phrase as insufficient for *ballot purposes* to properly register the dictates of an informed citizenry as to the governmental

policy issue presented. For that reason, my path partially diverges from that of my colleagues.

For the constitutional right of initiative to function properly, the proponents of an initiative must have reasonable access to the ballot, and the voters must have a reasonably accurate impression as to what they are voting on so that the vote can truly reflect the sentiments of the electorate.

Because the right of initiative is firmly grounded in our constitution, the courts of Missouri have established a pattern of allowing substantial latitude with regard to the technicalities of seeking to place an initiative measure on the ballot. See, e.g., *United Labor Comm. of Mo. v. Kirkpatrick*, 572 S.W.2d 449, 454–55 (Mo. banc 1978)("[P]rocedures designed to effectuate these democratic concepts should be liberally construed to avail the voters with every opportunity to exercise these rights.") Statutes dealing with initiative procedures are not allowed to "limit or restrict the rights conferred by the constitutional provision." *State ex rel. Elsas v. Mo. Workmen's Comp. Comm.*, 318 Mo. 1004, 2 S.W.2d 796, 801 (1928).

At the same time, in order for the people to effectively exercise self-government through the initiative process, they must know what it is they are voting on. *See, e.g., Union Electric Co. v. Kirkpatrick*, 678 S.W.2d 402, 405 (Mo. banc 1984) (ballot title is to "fairly and impartially summarize[ ] the purposes of the measure, so that the voters will not be deceived or misled").

This has been true from the earliest days of the initiative process. Section 6751, Chapter 59, of the 1909 statutes assigned the duty of drafting the ballot language to the attorney general (rather than the secretary of state) in very similar terms to those which are now a part of

Chapter 116. The original language stated:

In making such ballot title the attorney-general shall, to the best of his ability, *give a true and impartial statement of the purpose of the measure, and in such language that the ballot title shall not be intentionally an argument likely to create prejudice either for or against the measure.*

§ 6751, RSMo 1909 (emphasis added). The statute thus asked the attorney general to set aside any political role, and, as neutral arbiter for the benefit of the voter, briefly describe the purpose of the measure to be voted upon. Section 6751 went on to provide that any person dissatisfied with the ballot title may "appeal" the attorney general's "decision" to the circuit court on the ground that the title is "insufficient or unfair," and authorized the court to determine whether the language certified by the attorney general was an adequate summary.

Most of the provisions of Section 6751, RSMo 1909, now appear in Section 116.334 and Section 116.190. The language in Section 116.334 directs the Secretary of State to prepare the ballot summary, saying that the statement shall use "language neither intentionally argumentative nor likely to create prejudice either for or against a proposed measure."

The general principle is that ballot information is designed to provide an informed vote.

A ballot description must be complete enough to convey an intelligible idea of the scope and import of the proposed law; it ought not to be clouded by undue detail, or so abbreviated as not to be readily comprehensible. It must give a true and impartial statement of the purpose of the measure in such language as not intentionally to be an argument or to

be likely to create prejudice either for or against the measure.

*Mid–State Distrib. Co. v. City of Columbia,* 617 S.W.2d 419, 423 (Mo.App.1981) (*quoting* 42 Am.Jur.2d, *Initiative and Referendum,* § 46 (1969)).

Our cases have construed the terms "unfair" and "insufficient" of Section 116.190 as safeguarding the right to the voter to be free from language that would mislead:

> The words "insufficient" and "unfair" mean "inadequate" and "marked by injustice, partiality, or deception." *Hancock v. Secretary of State,* 885 S.W.2d 42, 49 (Mo.App. W.D.1994). The important test is whether the language fairly and impartially summarizes the purpose of the measure, so that the voters will not be deceived or misled. *Union Elec. Co. v. Kirkpatrick,* 678 S.W.2d 402, 405 (Mo. banc 1984).

*Bergman v. Mills,* 988 S.W.2d 84, 92 (Mo. App.1999). The cases recognize the importance of having an election produce a result that actually reflects the intent of the electorate.

Presumably, this is also part of the reason that Article III, section 50 provides that an initiative "shall not contain more than one subject and matters properly connected therewith." *See, e.g., Missourians to Protect the Initiative Process v. Blunt,* 799 S.W.2d 824, 830 (Mo. banc 1990). If there were more than one subject in a single proposition approved or rejected by voters, one could not be sure that each was approved or rejected on its own merits. The difficulties of making sure that voters understand from a ballot title what they are voting on are evident, and are such that at least one state has required that an initiative be passed by voters in two successive general elections before it can become law. *See* Nev. Const. Art. 19, § 2.

**Stem Cell Research and Cloning**

To understand the issues in this case, it is necessary to understand how the biology and practice of "stem cell research" relates to the science of cloning. The fact that Article III, section 50 has a "single subject" requirement for initiatives itself raises the question as to the relationship between "stem cell research" and "human cloning," so that they may both be the subjects of a single ballot measure. *See United Gamefowl Breeders Assn. v. Nixon,* 19 S.W.3d 137, 140 (Mo. banc 2000) (one measure may effect several changes if all are germane to one controlling purpose).

Although the parties dispute certain semantical assertions, and dispute what should be included in the summary, there is no dispute in this case about the basic biological facts. Stem cell research is research with "stem cells," cells that can, in the words of the initiative, "divide multiple times and give rise to specialized cells within the body." Stem cells can be derived from sources such as umbilical cords and placentas, called "adult stem cells." "Embryonic stem cells" are stem cells derived from excess blastocysts produced by "in vitro fertilization" ("IVF") at fertility clinics and from "cell reprogramming technology," such as "somatic cell nuclear transfer."

Nuclear transfer is not a union of egg and sperm. In nuclear transfer, the nucleus of an egg (containing the chromosomes) is removed. A human somatic (body) cell, (which already has the full complement of 46 chromosomes containing the DNA) is placed in the enucleated egg and fused with it by an electrical charge. The result is a single-celled living organism which is a genetic copy, from a cellular standpoint, of the person from whose body the cell was taken. That one-celled organism is not a fertilized egg, but it contains the 46 chro-

mosomes that are characteristic of human life, all drawn from the cell donor. It is called a zygote, just as a fertilized egg would be called a zygote. After nuclear transfer has produced the zygote, which quickly develops to the blastocyst stage, a stem cell researcher cuts open the blastocyst and harvests the stem cells that are in it. These stem cells would then be used to develop stem cell lines that can be used for various medical research purposes.

The one-celled zygote produced by nuclear transfer is a cloned organism. The testimony at trial shows that the verb "to clone" means simply to make copies of something. According to Dr. Melton, an expert at trial presented by Intervenor Danforth, the term cloning is used among scientists in various contexts. It might refer to making copies of DNA, cancer cells, stem cells, or other cells. Nuclear transfer is cloning. *See, e.g.,* Christopher L. Logan, Note, *To Clone or Not to Clone: Should Missouri Allow Cloning for Biomedical Research?*, 73 UMKC L.Rev. 861, 862–64 (Spring 2005). Indeed the brochure of the MCLC, in referring to nuclear transfer, says, "[t]his is sometimes called therapeutic cloning because it involves copying, or cloning, genetic material. . . ."

### The Purposes of the Initiative

The Stowers Institute for Medical Research is a member of the Missouri Coalition for Lifesaving Cures. The president and chief executive of the Institute is Dr. William Neaves, an expert in reproductive cell biology and endocrinology. Dr. Neaves was involved in the drafting of the proposed initiative. When asked at trial in this case to identify the purpose of the initiative, he stated that "one purpose was to address the persistent threat of criminalizing legislation in the Missouri General Assembly directed toward medical research with somatic cell nuclear transfer."

Another objective was "to outlaw human cloning in the sense that human cloning is producing a human version of Dolly, the sheep." Thus, he highlighted the objectives of (1) protecting medical research using somatic cell nuclear transfer, and (2) prohibiting an attempt to give birth to a cloned human.

### The Terms of the Initiative

The initiative, by its terms, would prohibit state and local governmental action that would interfere with or impose special burdens on efforts of Missouri researchers to conduct stem cell research to the full extent permitted under federal law. It would permit research with stem cells derived from excess blastocysts obtained from in vitro fertilization ("IVF") clinics and blastocysts obtained by nuclear transfer. It prohibits the harvesting of stem cells from a blastocyst that has remained unfrozen more than fourteen days. The initiative would prohibit the production of human embryos by fertilization solely for the purpose of stem cell research. The initiative provides other regulations of stem cell research, including a prohibition against any person selling blastocysts or eggs for stem cell research purposes. The initiative also restricts governmental entities from arbitrarily restricting funds designated for purposes other than stem cell research as a means of prohibiting such research.

The initiative also provides that no one may "clone or attempt to clone a human being," and defines that phrase to mean that no one may attempt to implant anything other than a fertilized egg in a uterus for the purpose of initiating a pregnancy. The initiative provides criminal penalties for violation of several provisions. Thus, the amendment is designed to "allow and set limitations on stem cell

research, therapies, and cures," as stated in the summary.

The Missouri Coalition for Lifesaving Cures ("MCLC") is a coalition proposing the initiative. The MCLC offers an explanation of the provisions of the initiative in a brochure it distributes and at the website www.MissouriCures. com.

### The Summary Statement

The summary statement certified by the Secretary of State states as follows:

Shall the Missouri Constitution be amended to allow and set limitations on stem cell research, therapies, and cures which will:

- ensure Missouri patients have access to any therapies and cures, and allow Missouri researchers to conduct any research, permitted under federal law;

- ban human cloning or attempted cloning;

- require expert medical and public oversight and annual reports on the nature and purpose of stem cell research;

- impose criminal and civil penalties for any violations; and

- prohibit state or local governments from preventing or discouraging lawful stem cell research therapies and cures?

This ballot summary was adopted directly from language proposed to the Secretary of State by the MCLC. The Secretary of State ("Secretary"), who is directed by Section 116.334 to certify a summary, adopted the language suggested to her by the MCLC, including the phrase, "ban human cloning or attempted cloning."

### Differences Between the Summary and the Initiative

The Secretary says that the summary tracks much of the language of the initiative, and argues that this insulates her summary from any attack. While there is overlap of language, there are very significant differences between the summary and the initiative. For instance, the *initiative* makes clear that the term "stem cell" includes both "adult" stem cells and "embryonic" stem cells, while the *summary* uses the term "stem cell" but does not mention that the term includes 1) adult stem cells, 2) embryonic stem cells from IVF blastocysts, and 3) embryonic stem cells from nuclear transfer. Second, the *initiative* uses the phrase "clone or attempt to clone a human being," which is then defined in the initiative to mean the implantation in a uterus of anything other than a fertilized human egg. In other words, it forbids the implantation of a cloned organism. The *summary*, in contrast, sets forth the phrase "human cloning" without further description of what is meant by that phrase.

### Conflict of Perspectives

Underlying this litigation is a conflict of perspectives about the ethics of nuclear transfer. The MCLC is a coalition of groups and individuals who have considered the biology of stem cell research and have satisfied themselves that the harvesting of stem cells from early embryos, and the use of nuclear transfer, are consistent with human dignity and are ethically proper. They have attempted to place in the initiative certain restrictions and limitations they consider ethically appropriate. The Proponents of the initiative, including intervenors Danforth and Eagleton, are motivated by what they see as the potentially powerful results from the research. They draw an ethical distinction between

nuclear transfer for research, on one hand, and nuclear transfer to produce a child, on the other. They propose allowing nuclear transfer cloning for *research* purposes only, not to create a pregnancy.

On the other hand, the Missourians Against Human Cloning (MAHC) is a co-alition of groups and individuals who believe that not all sources of stem cells for research are ethically acceptable. They and the intervenor Bishops are opposed to nuclear transfer because, they say, such a process creates a living zygote having the full complement of human chromosomal DNA contributed by the cell donor. They believe that it is ethically unacceptable to "artificially attempt to create a human embryo." They oppose the initiative because of their ethical convictions.

The nature of the underlying controversy is pertinent to understanding the Opponents' complaints about the summary. It is not exactly correct to believe the controversy is about research with stem cells. The controversy is about the *sources* of stem cells. And part of the controversy is about whether to use cloning techniques to produce blastocysts from which to obtain embryonic stem cells. The Opponents want a summary that highlights the precise nature of the underlying controversy. Of course, the MCLC, in drafting its initiative and in recommending the summary, is not required to cast the matter in terms that would please its opponents. Indeed, the MCLC has a constitutional right to draft the *initiative* as it sees fit. At the same time, the MCLC has no constitutional right to dictate the terms of the *summary*. See *Hancock v. Secretary of State*, 885 S.W.2d 42 (Mo.App.1994) and *Bergman v. Mills*, 988 S.W.2d 84 (Mo.App. 1999), in which the proposers of the amendment in each case were the ones unsuccessfully challenging the ballot titles.

Because of the importance of reasonable accuracy and impartiality with regard to the ballot *summary*, section 116.190 has placed the courts in a position of applying the law to help ensure that the ballot *summary* gives sufficient information to lead to an informed vote, while limiting judicial intervention to that which is necessary to protect clear constitutional objectives. The politicians, pundits, and activists can take sides on the underlying conflict, but the courts have no business taking one side or the other of the philosophical and scientific issues presented by the initiative.

> So that whatever may be the individual opinions of the justices of this court as to the wisdom or folly of any law or constitutional amendment, and notwithstanding the right which as individual citizens we may exercise with all other citizens in expressing through the ballot box our personal approval or disapproval of proposed constitutional changes, as a court, our single inquiry is, have constitutional requirements been observed, and limits of power been regarded.

*Edwards v. Lesueur*, 132 Mo. 410, 33 S.W. 1130, 1133 (1896) (*quoting Prohibitory Amendment Cases*, 24 Kan. 700, 706 (1881)).

We operate within the framework of the constitution and laws of this state. The 1909 statute did not provide for appeals from the circuit court decision, so for many years there were no appellate decisions concerning ballot titles. The cases that are reported reveal a willingness to allow latitude as to the summary statement and the fiscal note and summary in the face of a challenge by opponents of an initiative or referendum, as long as the ballot title is reasonably supported in the evidence.

This is illustrated in *Hancock v. Secretary of State*, 885 S.W.2d 42 (Mo.App. 1994), where this court dealt with a fiscal

note and fiscal note summary as to an initiative prepared by Mel Hancock and the "Hancock II Committee." The fiscal note and fiscal summary were drafted by the Committee for Legislative Research. *Hancock*, 885 S.W.2d at 44. The initiative, which was known as "Hancock II," would have changed a number of provisions of Article X, sections 16–24 of the Missouri Constitution (the original "Hancock Amendment"). *Id.* at 46. The initiative could have had an impact on state spending and the issuance of refunds to taxpayers. *Id.* at 48. The fiscal note summary, in attempting to describe the fiscal impact of the measure, stated:

> This proposal would require state and local spending cuts ranging from $1 billion to $5 billion annually. Cuts would affect prisons, schools, colleges, programs for the elderly, job training, highways, public health, and other services.

*Id.* at 44.

This court held, on appeal, that the fiscal prediction was a sufficient and fair summation of the fiscal impact. *Id.* at 49. The court also held that the reference in the summary to "prisons, schools, colleges," and so forth was not insufficient or unfair. *Id.* The Committee had selected these areas, the court noted from the evidence, because they were the areas affected by budget reductions in the prior year. *Id.* The court thus believed that the prior experience constituted a legitimate basis for forecasting the areas of future budget cuts. *Id.* This court reinstated the original summary (which the trial court had decertified) because the evidence supported the language. *Id.*

### Petition Stage v. Voting Stage

Before turning to an analysis of the evidence as to specific alleged deficiencies of the summary, I first note that the Opponents have focused their arguments on the possibility of *voters* being misled, and the *vote* being prejudiced. They have not addressed at all, in this court at least, the concerns that the summary will mislead petition signers. One could argue that the Opponents have abandoned any claim to de-certify the ballot title for *petition* purposes. But even assuming they intended to attack the summary at the petition stage as well, I would suggest that a ballot summary ambiguity is easily curable by the interested citizen at the petition stage (because the language of the initiative is attached to the petition), and the cost and burden of recirculating petitions is so great, that it would tend to frustrate constitutional objectives in such a case to require recirculation of the petitions.

Although sections 116.010(4) and 116.180 contemplate that generally the same "official ballot title" (including the summary statement and the fiscal note and summary) would appear both on the petitions and the ballot, the court, in upholding constitutional values, is not bound by usual statutory procedures where the strict enforcement thereof would burden the constitutional values in question. *See, e.g., State ex rel. City of El Dorado Springs v. Holman*, 363 S.W.2d 552 (Mo. banc 1962) (the Court refused to invalidate a ballot title that exceeded the statutorily prescribed word limitation where there was a necessity to do so to avoid being misleading); *State ex rel. Nixon v. Blunt*, 135 S.W.3d 416 (Mo. banc 2004) (the ten-week legal notice requirement of Section 116.240 could not take precedence over the Governor's constitutional authority to call a special election for a proposed constitutional amendment).

In *Union Electric Co. v. Kirkpatrick*, 678 S.W.2d 402 (Mo. banc 1984), the Court, in *obiter dictum*, stated that it believed the trial court had been "unduly concerned" about the ballot title (which the trial court

did not think clearly stated the proposal) which was on the petitions. *Id.* The Court noted that the "full [proposed] act appeared on the back of each petition and was entitled 'A Proposed Act Respecting Electrical Corporations.'" *Id.* The Court said, "we cannot see how the signers could have been deceived or misled *at this stage of the initiative process.*" *Id.* (emphasis added). The Court said that the "important title test" would be whether *voters* would be "deceived or misled," and noted that (because of the procedural posture of the case) that question was not before the Court. *Id.* (emphasis added). The Court thus recognized that a summary may be sufficient at the petition stage, because the initiative itself is attached to the petition, but not at the voting stage, where there is no reference beyond the summary itself. Once a voter steps into the booth and reads the summary, however, there is no one to ask, and no initiative to refer to for definitions.

In this case, Missourians Against Human Cloning and the intervenors aligned with them (collectively, "Opponents") bring a challenge that is unique among Missouri cases in that they presented specific evidence that there is an ongoing controversy about the ethics of human nuclear transfer that creates confusion about what otherwise might be relatively clear terminology. The underlying controversy entered the political arena long before the MCLC proposed this initiative.

The Opponents argue that the phrase "human cloning" is misleading and prejudicial because it will have a tendency to cause people to vote for a measure they *actually do* not favor. They argue that instead of saying the measure "bans human cloning," the summary should say that the measure will protect human cloning for "research purposes" or "therapeu-

tic purposes" while prohibiting human cloning for "reproductive purposes." Their assertion must be examined in the light of the evidence at trial.

The evidence at trial, and much of the published literature, shows that nuclear transfer, by its very nature, *is* cloning because it creates an organism that is a genetic copy of the cell donor. The evidence also showed that the issue of whether all human nuclear transfer should be called "human cloning," or whether that label should be applied only to efforts at reproductive cloning, has become a significant part of the controversy. The Opponents showed at trial that people on *both* sides of the issue as to the ethical propriety of nuclear transfer cloning wish to wave the banner of being against "human cloning." As a result, the debate has become highly semantical.

Although the evidence at trial related mostly to the legislative maneuvering in the states, there is no secret that there are several proposals in Congress related to nuclear transfer, and, though the effects of the proposals are contradictory, each one makes use of the term "human cloning" in a way that corresponds with one or the other of the positions of the parties in this case. For instance, the proposed Human Cloning Prohibition Act of 2005, S. 658, 109th Cong. (2005), and its counterpart in the House, H.R. 1357, 109th Cong. (2005), define "human cloning" as nuclear transfer that would produce a "living organism (at any stage of development) that is genetically virtually identical to an existing or previously existing human organism." The bill would prohibit the use of "nuclear transfer or other cloning techniques" as to human genetic material. The Senate bill, which has thirty cosponsors, is currently in committee.[1] The President's Council on Bioethics, defines "human cloning" in very

---

1.  S. 658, *available at* http://thomas.loc.gov.

much the same way as S. 658, as "[t]he asexual production of a new human organism that is, at all stages of development, genetically virtually identical to a currently existing or previously existing human being." *See* Logan, *To Clone or Not to Clone*, 73 UMKC L.REV. at 863 (*quoting* President's Council on Bioethics, Human Cloning and Human Dignity: An Ethical Inquiry, xxiv (July 2002), *available at* http://www. bioethics.gov).

At the same time, the proposed Human Cloning Ban and Stem Cell Research Protection Act of 2005, S. 876, 109th Cong.

(2005), and its counterpart in the House, H.R. 1822, 109th Cong. (2005), define the term "human cloning" as "implanting or attempting to implant the product of nuclear transplantation into a uterus or the functional equivalent of a uterus." The bill would make it unlawful to "conduct or attempt to conduct human cloning." The Senate bill, which has twelve cosponsors, is also currently in committee.[2]

The respective uses of the phrase "human cloning" in these federal bills could be shown as follows:

| S. 876 | S. 658 |
|---|---|
| "human cloning" = human nuclear transfer for reproduction purposes. This bill would protect human nuclear transfer for research, but forbid it to produce a pregnancy. | "human cloning" = all human nuclear transfer, whatever the ultimate purpose. This bill would forbid all nuclear transfer cloning of a human body cell, including nuclear transfer for research. |

Thus one bill protects nuclear transfer for research, while the other bill outlaws nuclear transfer for research (or any other purpose).

The use of "human cloning" continues when we turn to the statutes of other jurisdictions. Some states have banned human nuclear transfer, or have withheld public funding for nuclear transfer. Often, they refer to *all* aspects of human nuclear transfer as "human cloning." For instance, Arizona law provides that public monies of the state shall not be used for "human somatic cell nuclear transfer, *commonly known as human cloning.*" ARIZ. REV.STAT. ANN. § 35–196.04 (2005). Also in the same category are Arkansas, Indiana, Iowa, Michigan, South Dakota, and North Dakota. *See* ARK.CODE ANN. § 20–16–1001 (2006); IND.CODE ANN. § 16–18–2–56.5 (2005); IOWA CODE ANN. § 707B.3 (2006); MICH. COMP. LAWS ANN. § 333.16274 (2006); S.D. CODIFIED LAWS §§ 34–14–27 and 34–

14–27 (2006); and N.D. CENT.CODE § 12.1–39–02 (2005).

At the same time, other state statutes, in contrast, appear to have defined "human cloning" in essentially the same way as the initiative has defined it in this case. As the Secretary points out, the State of California forbids "cloning," defining it as "the practice of creating or attempting to create a human being by [nuclear transfer] *to initiate a pregnancy* that could result in the birth of a human being." CAL. HEALTH & SAFETY CODE § 24185 (2006) (emphasis added). To a similar effect are Connecticut and New Jersey. *See* CONN. GEN.STAT. ANN. § 19a–32d (2006); N.J. STAT. ANN. § 2C:11A–1 (2006).

The legislation of these states could be charted so as to indicate which state uses the term "human cloning" to mean *all* nuclear transfer and which use the term to mean only nuclear transfer for reproductive purposes:

---

2. S. 876, *available at* http://thomas.loc.gov.

| "Human cloning" means all human nuclear transfer cloning regardless of purpose, at any stage of development—these states either ban or restrict public funding for all nuclear transfer, calling it all "human cloning." | "Human Cloning" means human nuclear transfer cloning for pregnancy purposes. It does not refer to nuclear transfer cloning of humans for research purposes. These states specifically allow human nuclear transfer for research. |
| --- | --- |
| Arizona | California |
| Arkansas | Connecticut |
| Indiana | New Jersey |
| Iowa | |
| Michigan | |
| South Dakota | |
| North Dakota | |

The legislative conflict over the term "human cloning" suggests that when politicians and partisans on either side of the ethical and political divide seek a rhetorical advantage, they select "human cloning" as one of their catchphrases. While the evidence does not show how visible these controversies will be in November, 2006, it does show that the ongoing controversies create a climate of uncertainty as to the meaning of the phrase.

It is true, as the Secretary suggests, that the biggest news about cloning was the news in 1997 about Dolly the sheep. As the photographs revealed, Dolly was a fully developed sheep born after her nuclear transfer embryo had been implanted in the womb of a surrogate mother. Thus, in the absence of the ethical controversies about nuclear transfer for therapeutic purposes, it would be reasonable to believe that many voters would, upon seeing the phrase "human cloning," tend to envision a human version of Dolly the sheep.

The Opponents of the summary say, however, that the people who share their philosophical views are aware of the ethical controversy and will be misled by the summary because they oppose all "human cloning." Our record shows that there are in fact citizens likely to vote, including those following the teaching of the Roman Catholic Church, who believe that all forms of human cloning are ethically unacceptable. The Opponents presented Bishop Robert W. Finn, who advised the court approximately how many Roman Catholics reside in Missouri (approximately 850,000) and what the Roman Catholic Church teaches its people on the subject of "human cloning."

The Bishop testified that the Church opposes "human cloning" of all kinds, including nuclear transfer, because it "attempts to manufacture in an artificial way a human embryo, a human life." While the Bishop acknowledged that not all Catholics will follow the teachings of the Church in this regard, there is a reasonable inference from his testimony that many will. The Bishop testified that the Secretary's summary statement, considered in the voting booth in the absence of other information, would cause him to vote in favor of the initiative, though he actually would oppose it if properly informed. The Opponents say such voters who oppose nuclear transfer may end up, based on the summary, voting *in favor* of something he or she actually *opposes* ethically, especially if the voter steps into the booth relatively unprepared and makes a decision based on the ballot summary.

Thus, the Opponents argue, the initiative could become a permanent change to the constitution without the *initiative* actually having been favored by the voters, merely because the ambiguous and allegedly mis-

leading *summary* was favored by the voters. According to the argument of the Opponents, there is nothing about the summary that would even inform people of the fact that there is a controversy about whether the law should accommodate and protect nuclear transfer. Because people desire sophisticated medical research to obtain cures, and because practically everyone opposes efforts to produce human clones, the ambiguity in the summary language in its limited context is likely to generate prejudice in favor of passage among people who do not understand that one of the main purposes of the initiative is to vote on whether to help protect nuclear transfer.

The Secretary says that such a prejudice could not happen because voters do not think of nuclear transfer as cloning. She points to the evidence that one of the Proponents' experts conceded that "if you ask the person on the street about a *cloned human,* they are going to expect a baby." (Emphasis added.) The Secretary fails to note, however, that the summary specifically says "human cloning;" it does not say "cloned human."

The syntax of the phrase "human cloning," and the use of a participle rather than a noun in the summary, allows the ambiguity. The Proponents are correct that we usually think of a "clone," a noun, as indicating a full copy in the full development sense, as when speaking of a computer as an "IBM clone." Thus, as one of the Opponents' experts conceded, the phrase "human clone" is likely to conjure up the image of a baby produced through cloning. If the summary said that the initiative would "ban attempts to make a human clone," it would be more likely to be properly understood by all.

There is no evidence as to how many Missourians understand stem cell research, and how many know that one of the two main purposes of the initiative is to protect the opportunity for scientists to engage in nuclear transfer. If a voter knew that the term "stem cell" in the initiative is defined to include cells derived from nuclear transfer, the voter would be able to infer that the ban on "human cloning" does not ban nuclear transfer. The summary, however, does not define "stem cell," or "stem cell research," leaving the matter uncertain.

The record contains abundant evidence that the phrase "human cloning," when dealing with issues related to nuclear transfer, is considered ambiguous by so many writers and publications that they have found it necessary to distinguish nuclear transfer for research purposes from nuclear transfer for reproduction by the use of the adjectives "therapeutic and reproductive."

Many copies of publications of various governmental and private entities, such as the International Society of Stem Cell Research, the Harvard Stem Cell Institute, and the President's Council, were introduced at trial to show that it is common to draw a distinction between "therapeutic cloning" and "reproductive cloning." This distinction is drawn because many believe there are reasons to distinguish between cloning for medical research purposes and cloning to give birth to a cloned child. The Opponents in this case also point out that the brochure of the Missouri Coalition for Lifesaving Cures, in attempting to define for the reader what the initiative would accomplish, *itself* uses the phrases "therapeutic cloning" and "reproductive cloning":

> This definition clearly prohibits implanting a cloned blastocyst into a woman's uterus. *In other words, it prohibits the creation of a human version of Dolly the Sheep* (i.e., *what is sometimes called "reproductive cloning").*

It also prohibits implanting a cloned blastocyst or embryo in a woman's uterus for any other purpose. *For example, it prohibits implanting a cloned blastocyst into a woman's uterus and later using it as source of stem cells or "body parts."* The Initiative only allows SCNT technology to be used to copy a patient's cells in a lab dish. This is *sometimes called "therapeutic cloning"* because it involves copying, or cloning, genetic material from a patient's cell to make life-saving stem cells that will match the patient's genetic makeup and avoid transplant rejection problems. (Underlining in original; italics added.)

It may have some significance that when Dr. Neaves was asked at trial to comment on the purpose of the initiative, one thing he mentioned was the purpose to "outlaw human cloning *in the sense that human cloning is producing a human version of Dolly, the sheep.*" (Emphasis added.) Perhaps because he was in court, he wanted to be especially clear; but it evidently seemed right not to simply say the second purpose was to "outlaw human cloning." He went on to explain *in what sense* he was using that terminology. That is, in fact, what writers generally have done when they wished to be clear about what they mean.

The experts acknowledge that the terms "therapeutic cloning" and "reproductive cloning" are used commonly in the popular articles and in the popular media. Even if scientists do not routinely use the terms "reproductive" and "therapeutic," the terms are used so often that some voters will be familiar with them. A large percentage of the people who will be asked to vote on this measure are not biological scientists. They are ordinary people who

get most of their information from the "popular articles" and the popular media.

Although no one seems particularly concerned about the ambiguity working against passage of the initiative, the ambiguity could in fact do so. That could happen as to voters who strongly favor encouraging nuclear transfer. Because "stem cell research" and "stem cell" are not defined in the summary, such voters could end up exercising a vote against the measure because they are afraid that a vote to ban "human cloning" would result in banning the use of the very nuclear transfer techniques they favor. Ironically, if the initiative had been generated by people who oppose nuclear transfer (such as the MAHC), and if the drafters had defined "stem cell" in the *initiative* to mean only adult stem cells, the summary could read exactly as it does, but the effect would be the opposite of the initiative in this case.

This case is unlike *Hancock* and other Missouri ballot title cases because it is about the use of a term that will be ambiguous as to some voters. The evidence does not support the notion that the phrase "human cloning" is clear enough that all citizens, regardless of philosophical bent, will generally know what they are voting on.

### Conclusion

There is evidence that a significant number of people will be uncertain about what is meant by "human cloning" when they see the ballot title. Of course, newspaper articles and other information sources will help inform some. The Secretary's "fair ballot language summaries" prepared pursuant to section 116.025 (and posted in polling places) should also help,[3] but there is no evidence that very many people will

---

3. The "fair ballot language statements" are not before us in this case. They are to be

drafted within twenty days "of receiving a statewide ballot measure." § 116.025, RSMo

see them. Although judicial intervention in the initiative process must be cautiously exercised, I cannot ignore an ambiguity that is easily curable, with minimal intervention, so that it will give voters a summary less likely to prejudice the vote.

The record shows that the ambiguity could be sufficiently cured for voting purposes simply by the addition of a word. I would suggest the word that usually comes up in this context—the modifier "reproductive," a word used by the MCLC itself in its brochure. I believe the modifier "reproductive" would help alleviate the ambiguity because it would allow the inference that "stem cell research" would include the use of cloning to produce stem cells for *research* purposes, but not for purposes of trying to create a human version of Dolly, the sheep.

The use of the adjective "reproductive" would allow it to be said that all voters—whether favoring the viewpoint of the MCLC or the MAHC or having some other viewpoint—are more likely to cast a free, intelligent, and informed vote—one not prejudiced by misunderstanding. In my view, the change would achieve a proper balance between constitutional objectives by protecting a citizen's valuable right to place initiatives on the ballot without undue interference, and the right of the voting citizens of this state to have a relatively clear idea as to what they are voting on. Accordingly, while I would not de-certify the summary for *petition* purposes, I would require the addition of a clarifying adjective to the *ballot* so that the vote on this important measure better captures the actual desires of the electorate.

Supp.2005. It is not clear what "receiving" the measure means, but it may refer to receipt of the signed petitions. These statements are not limited to 100 words, and are designed to give a fuller description than the ballot title.