Melton D. HANCOCK and Hancock
II Committee, Respondents,

v.

SECRETARY OF STATE and Committee
on Legislative Research, Appellants.

No. WD 50120.

Missouri Court of Appeals,
Western District.

Oct. 21, 1994.

Case Retransferred Oct. 27, 1994.

Court of Appeals Opinion Readopted
Oct. 31, 1994.

Jeremiah W. (Jay) Nixon, Atty. Gen., Robert L. Presson, Asst. Atty. Gen., Jefferson City, for appellants.

Simon B. Buckner, Buckner & Buckner, Jefferson City, for respondents.

Before ULRICH, P.J., and KENNEDY and HANNA, JJ.

PER CURIAM:

The Missouri Secretary of State and the Committee for Legislative Research (the Committee) appeal from the judgment finding the fiscal note summary prepared by the Committee to be insufficient and unfair and substituting the court's draft of the fiscal note summary to appear on the ballots of the general election as Proposition 7, November 8, 1994. The principal issue presented is whether the trial court erred in declaring the fiscal note summary prepared by the Committee as Proposition 7, commonly referred to as "Hancock II," insufficient and unfair. § 116.190, RSMo Supp.1993.[1]

The parties stipulated to the facts presented to the Circuit Court. Pursuant to section 116.332, RSMo 1986, language for a proposed initiative constitutional amendment (Hancock II) was submitted to the Secretary of State for sufficiency as to form. The Secretary of State certified the sufficiency of the petition and a petition title on January 14, 1994. The

1. Whether the Circuit Court of Cole County has authority to substitute its language for that of the Committee where the Committee's fiscal note summary is insufficient and unfair is not addressed in this opinion.

petition was circulated to collect the requisite number of signatures to place the initiative on the ballot. The signed petition pages were submitted to the Secretary of State for verification. The Secretary of State, pursuant to section 116.130, RSMo Supp.1993, submitted the petition pages to the county clerks for verification. The county clerks certified the valid signatures and referred the numbers to the Secretary of State. Pursuant to section 116.200, RSMo 1986, the Secretary of State certified that enough signatures had been obtained to place the Hancock II initiative on the November 8, 1994, general election ballot.

On September 1, 1994, the proposal was referred to the Oversight Division of the Committee for preparation of the requisite fiscal note and to the Committee to prepare the fiscal note summary. Pursuant to section 116.170, RSMo Supp.1993, on September 7, 1994, the Oversight Division of the Committee provided a fiscal note and the Committee provided a fiscal note summary to the Secretary of State. The fiscal note summary stated: "This proposal would require state and local spending cuts ranging from $1 billion to $5 billion annually. Cuts would affect prisons, schools, colleges, programs for the elderly, job training, highways, public health, and other services." The fiscal note prepared by the Oversight Division acknowledged that the exact amount of revenues that would be added to the calculation of Total State Revenue under the terms of the proposal were uncertain; the estimates ranged from $1,440,000,000 to approximately $5,400,-000,000.

The respondents filed their petition in the Circuit Court of Cole County on September 14, 1994, challenging the sufficiency and fairness of the fiscal note and the fiscal note summary pursuant to section 116.190, RSMo Supp.1993. Section 116.190, RSMo 1993, provides in part that

3. The petition shall state the reason or reasons why the : ... fiscal note and fiscal note summary are insufficient or unfair and shall request a different official ballot title or fiscal note and fiscal note summary.

4. ... In making the legal notice to election authorities under section 116.240, the Secretary of State shall certify the language which the court certifies to him.

The Circuit Court entered its order on October 11, 1994, holding:

1. Although the fiscal note considers only one of the possible scenarios that could follow from the adoption of the Hancock II proposal, its prefatory language sufficiently and fairly reflects the uncertainties associated with the costs and savings that would accompany passage of the initiative proposal.

2. The fiscal note summary, which would appear on the ballot, is insufficient and unfair in that it (a) fails to reflect the uncertainty of costs or savings that may accrue from passage of Hancock II, (b) makes predictions about program cuts that are unwarranted by the text of the proposal, the text of the fiscal note or the evidence before the court.

The circuit court then drafted and certified a new fiscal note summary to the Secretary of State, reading as follows: "Savings or costs to government cannot be determined. Special taxes approved by voters in the past are likely to trigger refunds to income tax payers [sic] at the expense of other state programs and other taxpayers."

Appellants filed their notice of appeal on October 11, 1994. The parties filed briefs pursuant to the expedited briefing schedule directed by this court, and argument was heard on October 18, 1994.

## THE COMMITTEE ON LEGISLATIVE RESEARCH AND THE DIRECTOR OF THE OVERSIGHT DIVISION

A brief review of the statute establishing the Committee on Legislative Research and the Director of the Oversight Division is helpful. The Committee is a permanent joint committee of the General Assembly comprised of the chairman of the Senate Appropriations Committee, nine other senators, the chairman of the House Budget Committee, and nine members of the House of Representatives. § 23.010, RSMo 1986. "No major party shall be represented by more than six members from the house nor more than six from the senate on the Committee."

§ 23.010, RSMo 1986. Chairmanship of the Committee rotates every two years, and alternates between a member of the house and a senator. § 23.070, RSMo 1986. An Oversight Division is established by the Committee "to prepare fiscal notes and to conduct management audits and program audits of state agencies," and a subcommittee comprised of not less than six members of the Committee, "one-half of the members appointed by the Chairman from the house he represents and one-half of the members appointed by the Vice–Chairman from the house which he represents" supervises the Oversight Division. § 23.150.1, RSMo 1986. The Committee appoints a Director of the Oversight Division and other personnel. § 23.150.2, RSMo 1986. The Director must be "qualified by training and experience" to conduct audits. § 23.150.2, RSMo 1986. Employees of the division "shall be professional persons possessing a wide knowledge and demonstrated expertise in governmental programming and financial planning, in conducting program review evaluations and analytic studies, and of federal, state, and local government budgetary processes, laws and regulations of the State of Missouri." § 23.150.2, RSMo 1986. Finally, to accomplish its significant tasks, the Committee is granted subpoena power and authority to compel testimony under oath. § 23.180, RSMo 1986.

### APPELLANTS' MOTION TO DISMISS IN THE TRIAL COURT

The Secretary of State and the Committee alleged that Mr. Hancock's petition failed to name the appropriate defendant and, therefore, pursuant to section 116.190, RSMo Supp.1993, failed to state a claim for which relief can be granted. Appellants' motion to dismiss Respondents' petition was denied by the trial court. Appellants claim the trial court erred.

■ As originally filed, Respondents' petition named the Secretary of State and Jeanne A. Jarrett, the Director of the Oversight Division of the Committee rather than the Committee itself. Subsequently, Mr. Hancock amended his petition by leave of court.

Section 116.190.2, RSMo 1993, provides, in pertinent part:

> When the fiscal note and fiscal note summary are in dispute, the petition shall name the committee on legislative research as a party defendant and service may be had on the director of the oversight division for the committee on legislative research.

Rule 55.33 permits the relation back of amendments to pleadings and is to be liberally applied. *Southwestern Bell v. Com'n on Human Rights*, 863 S.W.2d 682, 685 (Mo. App.1993). "Leave to amend a petition contemplates an amendment which will cure the defects of the petition without changing the essential basis of the cause of action originally attempted to be plead [*sic*]." *Laux v. Motor Carriers Council of St. Louis, Inc.*, 499 S.W.2d 805, 807 (Mo.1973), *superseded by statute as stated in Koenke v. Eldenburg*, 753 S.W.2d 931 (Mo. banc 1988). Rule 55.33(c) states that

> [a]n amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and within the period provided by law for commencing the action against the party and serving notice of the action, the party to be brought in by amendment: (1) has received such notice of the institution of the action as will not prejudice the party in maintaining the party's defense on the merits and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

■ Pursuant to section 116.190.2, RSMo Supp.1993, serving the Director of the Oversight Division is the appropriate way to give the Committee notice of the suit challenging the sufficiency of the fiscal note summary. Mr. Hancock served the Director of the Oversight Division within the time for instituting the lawsuit. § 116.190.1, RSMo Supp. 1993. Even though the Director was the proper defendant in a challenge to a fiscal note summary prior to the 1993 amendment to the statute, the Director knew or should have known as a public official that after the

amendment the Director is the agent for the Committee. Consequently, the Committee's statutory agent had actual notice of the institution of the lawsuit within the time allowed; the Director knew or should have known that the Committee was the proper defendant; and, as a result, the Committee was not prejudiced in its defense when the trial court allowed the amendment changing the party against whom the claim was asserted to relate back to the date of the original pleading.

This point is denied.

## SUFFICIENCY AND FAIRNESS OF THE FISCAL NOTE SUMMARY

Appellants claim that the trial court erred in holding that the fiscal note summary prepared by the Committee, the language to appear on the November 8, 1994, ballot as Proposition 7, was insufficient and unfair, § 116.190.3, RSMo Supp.1993.[2] Appellants contend that the fiscal note summary was a sufficient and fair description of the fiscal note and that the fiscal note was a sufficient and fair statement of the financial impact Hancock II could reasonably have upon state government.

The facts in the case were presented by stipulation. The standard of review is the standard the Missouri Supreme Court established for appellate review in suits tried without a jury. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). In lower court cases tried without a jury, the appellate court must sustain the decree or judgment of the trial court "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Id.* at 32. The appellate court "may weigh the evidence before the circuit court when the record engenders a firm belief that the judgment is wrong."

*State ex rel. Rice v. Bishop*, 858 S.W.2d 732, 737 (Mo.App.1993).

The stipulated evidence presented to the trial court regarding Hancock II's reasonably anticipated fiscal impact is reviewed to determine whether the trial court's decision that the fiscal note summary was insufficient and unfair was against the weight of the evidence. The original Hancock amendment (Hancock I), Article X, §§ 16–24 of the Missouri Constitution, imposes a limit on the amount of taxes which may be levied by the General Assembly without voter approval. According to Hancock I, the General Assembly can impose a new state tax without voter approval only if the proceeds of the new tax and existing revenue measures combined do not exceed the "revenue limit" defined by the mathematical formula articulated in Article X, § 18(a).

Hancock II, if adopted by referendum, would change the language of a number of key provisions in Hancock I. Section 18(a) of Hancock I provides that, for each fiscal year, "the general assembly shall not impose taxes of any kind which, *together with all other revenues of the State, federal funds excluded,* exceed the revenue limit established in this section." (emphasis added) Section 18(b) of Hancock I provides that "[f]or any fiscal year in the event that *total state revenues* [3] exceed the revenue limit established in this section by one percent or more," the excess revenues will be refunded to the taxpayers. (emphasis added)

In Hancock II, the language of 18(a) and 18(b) is modified. Section 18(a) is revised to state:

the general assembly shall not establish or impose a tax, license or fee of any kind which, *together with all Total State Revenue and all other revenue (including but not limited to revenue generated by any voter approved state-wide law and any*

---

**2.** "The petition shall state the reason or reasons why the official ballot title is insufficient or unfair or why the fiscal note and fiscal note summary are insufficient or unfair and shall request a different ballot title or fiscal note and fiscal note summary." § 116.190.3, RSMo Supp.1993.

**3.** Section 17(1) defines "total state revenues" as "all general and special revenues, license and

fees, excluding federal funds, as defined in the budget message of the governor for fiscal year 1980–81. Total state revenues shall exclude the amount of any credits based on actual tax liabilities or the imputed tax components of rental payments, but shall include the amount of any credits not related to actual tax liabilities."

*revenue generated by a tax, license or fee levied by the state on any private or quasi-private entity),* exceeds the revenue limit established in this section. (emphasis added) Section 18(b) is revised in Hancock II to provide that "[f]or any fiscal year in the event that *the revenue limit established in sub-section (a) of this section* is exceeded by one percent or more," (emphasis added) the excess revenues will be refunded to the taxpayers.

The effect of these modifications is to broaden the categories of revenue which, under Hancock II, would be included in calculating the revenue limit imposed upon the state. Additionally, Hancock II includes section 25, an entirely new section, which provides in part that "[i]n the event of a conflict or inconsistency between the provisions of section 16 through 25, of this Article and any other provisions of this constitution, then the provisions of sections 16 through 25, shall control."

Pursuant to section 116.170, RSMo Supp. 1993, the Oversight Division of the Committee prepared a fiscal note to forecast the fiscal impact of Hancock II, and the Committee prepared the fiscal note summary. In evaluating the financial consequences of Hancock II, the Committee considered five categories of revenue which were excluded from the computation of the revenue limit in Hancock I but which are arguably included in the computation of the revenue limit by Hancock II.

The first category of such revenue considered by the Committee consists of two voter-approved taxes which became effective after the adoption of Hancock I. These two taxes—Proposition A (highway taxes) and Proposition C (sales taxes)—were excluded from the "revenue limit" in Hancock I by virtue of being voter approved. *See, Goode v. Bond,* 652 S.W.2d 98 (Mo. banc 1983). However, as both the Committee and Mr. Hancock have stipulated, the revenues of Proposition A and Proposition C would not be excluded from the revenue limit in Hancock II because of Hancock II's revision of section 18(a), quoted above.

The second category of such revenue considered by the Committee consists of five more voter-approved tax propositions which became law after the adoption of Hancock I. However, unlike tax propositions A and C described in the previous paragraph, these five tax measures became part of the Missouri Constitution. These constitutional tax propositions include: taxes for state parks and soil conservation, Article IV, §§ 47(a)–47(c); lottery revenues, Article III, § 39(b); riverboat gaming revenues, Article III, § 39(d); bingo revenues, Article III, § 39(a); and local motor fuel taxes, Article IV, § 30(a).

These five constitutional taxes are excluded from the revenue limit by Hancock I because in the corresponding sections of the Missouri Constitution (Article IV, §§ 47(a)–47(c); Article III, § 39(b); Article III, § 39(d); Article III, § 39(a); and Article IV, § 30(a)), the language specifically excludes the resulting revenues from "total state revenues." However, in Hancock II, the revenues included in calculating the revenue limit are no longer limited to "total state revenues." Furthermore, section 25(a) of Hancock II provides that, in the event of a conflict between the provisions of Hancock II and any other provisions of the Missouri Constitution, the provisions of Hancock II control. Thus, attempted exclusion of these five taxes within other titles of the constitution may be meaningless if proposed section 25(a) is valid and controlling.

The third category of revenue considered by the Committee consists of federal reimbursement allowances paid by hospitals and nursing homes. The term "revenue" is defined as income that a state "collects and receives into the treasury for public use." *Buechner v. Bond,* 650 S.W.2d 611, 613 (Mo. banc 1983). The vast majority of the federal reimbursement allowances paid by hospitals and nursing homes are never deposited into the state treasury since such payments are made to qualify for federal matching funds. Consequently, the federal reimbursement allowances do not constitute "revenue." The federal reimbursement allowances have not been included in "total state revenue" by Hancock I. In their Joint Stipulation of Facts filed with the trial court, the parties

agree that federal reimbursement allowances would be included as total state revenue by Hancock II.

The fourth category of such revenue considered by the committee consists of local use taxes which, like the federal reimbursement allowances, are never deposited into the state treasury. Like the federal reimbursement allowances, the local use taxes do not constitute "revenue," *Buechner v. Bond,* 650 S.W.2d at 613, and have not been included in "total state revenue" by Hancock I. In their Joint Stipulation of Facts filed with the trial court, the parties acknowledge that Hancock II would include the local use taxes in determining total state revenue.

The fifth category of revenue considered by the Committee consists of funds received from the federal government. Such funds have not been included in "total state revenue" by Hancock I, since section 17(1) explicitly excludes federal funds from inclusion as part of "total state revenue" and section 18(a) explicitly excludes federal funds from the revenues to be included in calculating the revenue limit imposed upon state government.

Hancock II, like Hancock I, also explicitly excludes federal funds from the definition of "total state revenue" in its section 17(1); however, Hancock II's version of section 18(a) omits the language excluding federal funds from revenues included in computation of the revenue limit. Under Hancock II, "total state revenues," defined in section 17(1), are not the only revenues included in calculating the revenue limit. Therefore, arguably, Hancock II's version of section 18(a) suggests that federal funds would be added to the computation of the revenue limit.

In its fiscal note, the Committee included a chart which outlined two alternative predictions of the fiscal impact of Hancock II in fiscal year 1996. In the first column (Interpretation 1), the Committee assumed that

federal funds would not be included in calculating the revenue limit under Hancock II. In the second column (Interpretation 2), the Committee assumed that federal funds would be included in such a calculation. The Committee's chart is reproduced below, and the amounts listed therein (expressed in millions of dollars) are the same as the amounts agreed upon by the parties in their Joint Stipulation of Facts filed with the trial court:

| | Interpretation 1 | Interpretation 2 |
|---|---|---|
| Total State Revenue Limit Plus One Percent | 6,126.7 | 6,126.7 |
| Projected Total State Revenues | 5,945.9 | 5,945.9 |
| Current Unused Revenue Limit | 180.8 | 180.8 |
| | | |
| Revenue Additions | | |
| Prop C Sales Tax | 553.7 | 553.7 |
| Prop A Highway Taxes | 142.7 | 142.7 |
| Parks and Soil Sales Taxes | 55.6 | 55.6 |
| Lottery Sales | 310.0 | 310.0 |
| Less Prizes | (148.8) | 0.0 |
| Riverboat Gaming Total (Fees and Taxes) | 19.5 | 70.0 |
| Bingo Revenues | 9.0 | 9.0 |
| Local Motor Fuel Tax Distributions | 106.3 | 106.3 |
| Local Use Tax | 55.0 | 55.0 |
| Hospital Reimbursement Allowance | 320.0 | 320.0 |
| Nursing Home Reimbursement Allowance | 20.0 | 20.0 |
| Federal Funds | 0.0 | 3,750.0 |
| Total Revenue Additions | 1,443.0 | 5,392.3 |
| | | |
| Total State Revenue + Revenue Additions | 7,388.9 | 11,338.2 |
| One Percent Cushion | 60.7 | 60.7 |
| Spending Cut Required | 1,322.9 | 5,272.2 |

The text of the fiscal note provides the following explanation of the two alternative predictions outlined in the Committee's chart:

In the case of the lower figure, the General Assembly would have to reduce state revenues for FY 1996 by approximately $1,320,000,000 in order to avoid paying $1,320,000,000 worth of refunds in FY 1998 (at the earliest) or reducing sales taxes by a similar amount. In the case of the higher figure, the legislature would have to cut revenues by $5,270,000,000 for FY 1996 or pay that amount in refunds in FY 1998 (at the earliest) or reduce the sales tax by that amount.

■ The words "insufficient" and "unfair" require definition. Statutory interpretation requires that the common meaning be applied to words. *Buechner v. Bond,* 650 S.W.2d 611 (Mo. banc 1983). Insufficient means "inadequate; especially lacking adequate power, capacity, or competence." Merriam Webster's Collegiate Dictionary 607 (10th ed. 1993). The word "unfair" means to be "marked by injustice, partiality, or deception." Merriam Webster's Collegiate Dictionary 1290 (10th ed. 1993). Thus, the words insufficient and unfair as used in section 116.190.3, RSMo Supp.1993, and applied to the fiscal note mean to inadequately and with bias, prejudice, deception and/or favoritism state the fiscal consequences of the proposed proposition. As applied to the fiscal note summary, insufficient and unfair means to inadequately and with bias, prejudice, or favoritism synopsize in thirty-five words or less, section 116.170.3, RSMo Supp.1993, the fiscal note.

■ The trial court found the fiscal note not to be insufficient and unfair. However, the trial court found the fiscal note summary to be insufficient and unfair. Contrary to the trial court's finding, the weight of the evidence established that the Committee's fiscal note summary was not insufficient and unfair. The first sentence of the Committee's summary stated that Hancock II "would require state and local spending cuts ranging from $1 billion to $5 billion annually." The trial court held, in its decision, that this sentence failed "to reflect the uncertainty of costs or savings that may accrue from passage of Hancock II." The Committee is a unique legislative institution possessed of an institutional knowledge and history, experience, and expertise regarding the fiscal impact of proposed law. The evidence before the trial court indicated the virtual certainty of a significant fiscal impact upon state revenues. The only real uncertainty concerned the amount of this impact; and the $1 billion to $5 billion range contained in the fiscal note summary was a sufficient and fair summation of the fiscal note itself, as well as a sufficient and fair forecast of Hancock II's estimated cost to state government.

The second sentence of the Committee's fiscal note summary stated that spending cuts required by Hancock II would affect "prisons, schools, colleges, programs for the elderly, job training, highways, public health and other services." The trial court held that this sentence made "predictions about program cuts that are unwarranted by the text of the proposal, the text of the fiscal note or the evidence before the Court."

However, this conclusion, too, was against the weight of the evidence. The sentence indicates broad areas of services which may reasonably be affected. The Committee listed these areas because these were the areas affected by budget reductions in 1992. Because experience provides guidance in forecasting future budget cuts, this evidence provided ample evidence for finding that the language of the second sentence was not an insufficient and unfair fiscal note summary.

■ The fiscal note summary is limited to thirty-five words. It cannot detail explanation of the fiscal impact of the proposed referendum, and this summary does not purport to do so. Whether the summary presented is the best language for describing the referendum's effect is not the test. The burden is on the opponents of the language to show that the language was insufficient and unfair, and the burden was not met.

The fiscal note summary prepared by the Committee was not proven insufficient and unfair, and it and the fiscal note are ordered certified to the Secretary of State pursuant to section 116.190, RSMo Supp.1993. The judgment of the trial court is reversed.