Hardy BILLINGTON, et al., Appellants,

v.

Robin CARNAHAN, Respondent.

No. WD 75602.

Missouri Court of Appeals,
Western District.

Sept. 17, 2012.

Clayton J. Callen, for Appellants.

James R. Layton, Jefferson City, for Respondent.

Before Special Division: JAMES M. SMART, JR., Presiding Judge, JOSEPH M. ELLIS, Judge and KAREN KING MITCHELL, Judge.

JOSEPH M. ELLIS, Judge.

Hardy Billington, Ron Calzone, Bev Ehlen, William Clark Hardin IV, James MN. Harris, Scott Magill, and Ray Rowland ("Appellants") are Missouri citizens who brought an action in the Circuit Court of Cole County challenging Secretary of State Robin Carnahan's official summary statement of a proposed amendment to the constitutional provisions governing the process by which appellate judges are selected in Missouri. This proposed amendment is to be placed on the ballot for the November 2012 general election. The circuit court, after hearing argument, entered a judgment on the pleadings in favor of the

Secretary of State ("Secretary").[1] This appeal followed. We affirm.

On May 10, 2012, the Missouri general assembly approved Senate Joint Resolution No. 51 ("SJR 51"), now officially designated "Constitutional Amendment 3," resolving to submit to the voters a referendum repealing sections 25(a) and 25(d) of article V of the Missouri Constitution and replacing them with new language, as reflected below with the new language in **bold** and deleted language in [brackets]:

Section 25(a). Whenever a vacancy shall occur in the office of [judge of any of the following courts of this state, to wit: The supreme court, the court of appeals, or in the office of] circuit or associate circuit judge within the city of St. Louis [and], Jackson County **or any other circuit electing under section 25(b) to have their circuit and associate circuit judges appointed,** the governor shall fill such vacancy by appointing one of three persons possessing the qualifications for such office, who shall be nominated and whose names shall be submitted to the governor by a nonpartisan judicial commission established and organized as hereinafter provided. **Whenever a vacancy shall occur in the office of judge of the supreme court or the court of appeals, the governor shall fill such vacancy by appointing one of four persons possessing the qualifications for such office, who shall be nominated and whose names shall be submitted to the governor by a nonpartisan judicial commission established and organized as hereinafter provided.** If the governor fails to appoint any of the nominees within sixty days after the list of nominees is submitted, the nonpartisan judicial commission making the nomination shall appoint one of the nominees to fill the vacancy.

Section 25(d). Nonpartisan judicial commissions whose duty it shall be to nominate and submit to the governor names of persons for appointment as provided by sections 25(a)-(g) are hereby established and shall be organized on the following basis: For vacancies in the office of judge of the supreme court or of the court of appeals, there shall be one such commission, to be known as "The Appellate Judicial Commission"; for vacancies in the office of circuit judge or associate circuit judge of any circuit court subject to the provisions of sections 25(a)-(g) there shall be one such commission, to be known as "The . . . . . . Circuit Judicial Commission", for each judicial circuit which shall be subject to the provisions of sections 25(a)-(g)[;]. The appellate judicial commission shall consist of [a judge of the supreme court selected by the members of the supreme court, and the remaining members shall be chosen in the following manner:] **seven voting members and one nonvoting member. The members of the supreme court shall select a former judge, who has not lost a retention election or been removed for cause, of the court of appeals or the supreme court to serve as the nonvoting member of the commission. Nonvoting members shall be selected for terms of four years, with the first term beginning January 15, 2013.** The members of the bar of this state residing in each court of appeals district shall elect one of their number to serve as a **voting** member of said commission[, and]. The governor shall appoint [one citizen, not a member of the bar] **four citizens, one**

---

1. The court's actual judgment indicates that the case was "dismissed in the Defendant's favor with prejudice," but the language of the judgment, itself, indicates that what the court actually did was grant the defendant's motion for judgment on the pleadings.

from [among the residents of] each court of appeals district **and one from the state at-large,** to serve as [a member] **voting members** of said commission[, and]. **The terms of appointed members and of the supreme court judge member of the appellate judicial commission serving on January 15, 2013, shall end on that day. The governor shall appoint two members to the commission for terms ending January 15, 2015, and appoint two members for terms ending January 15, 2017. The terms of all subsequently appointed commission members shall end four years after the termination of the prior term. Vacancies occurring in unexpired terms shall be filled for the remainder of the unexpired term.** The **voting** members of the commission shall select one of [their number] **the voting members** to serve as chairman. Each circuit judicial commission shall consist of five members, one of whom shall be the chief judge of the district of the court of appeals within which the judicial circuit of such commission, or the major portion of the population of said circuit is situated and the remaining four members shall be chosen in the following manner: The members of the bar of this state residing in the judicial circuit of such commission shall elect two of their number to serve as members of said commission, and the governor shall appoint two citizens, not members of the bar, from among the residents of said judicial circuit to serve as members of said commission, the members of the commission shall select one of their number to serve as chairman; and the terms of office of the members of such commission shall be

fixed by law, but no law shall increase or diminish the term of any member then in office. No member of any [such] commission other than a judge shall hold any public office, and no member shall hold any official position in a political party. Every [such] commission may act only by the concurrence of a majority of its **voting** members. The members of [such commission] **commissions** shall receive no salary or other compensation for their services but they shall receive their necessary traveling and other expenses incurred while actually engaged in the discharge of their official duties. All [such] commissions shall be administered, and all elections provided for under this section shall be held and regulated, under such rules as the supreme court shall promulgate.

Article V, § 25(d), sets forth the process by which the members of the nonpartisan Appellate Judicial Commission and Circuit Judicial Commission are selected. Currently, the Appellate Judicial Commission ("the Commission") consists of: (1) a judge of the Supreme Court selected by the members of the Supreme Court, (2) three members of the bar of this state selected by members of the bar,[2] and (3) three citizens who are not permitted to be members of the bar, selected by the Governor.[3] *See* Mo. Const. art. V, § 25(d). Thus, the current Appellate Judicial Commission consists of seven members, all of whom are entitled to vote and three of whom must be nonlawyers.

SJR 51("Amendment 3") increases the size of the Appellate Judicial Commission to eight members—seven voting members and one nonvoting member. The nonvoting member would be a former judge se-

---

2. These bar members are selected from each of the three court of appeals districts by members of their respective district.

3. These citizens are also selected from each of the three court of appeals districts.

lected by the judges of the Supreme Court. Of the seven voting members, three will be members of the bar selected in the same manner as the current provision. The remaining four voting members, however, will be citizens selected by the Governor.[4] Thus, Amendment 3 (1) eliminates the voting judge member selected by the Supreme Court under the current provision and replaces that position with a nonvoting former judge member, (2) increases the number of voting members selected by the Governor from three to four, and (3) removes the limitation on the Governor that the members he selects cannot be members of the bar.[5] Amendment 3 does not propose any changes to the method by which members of the circuit judicial commissions are selected.

Since SJR 51 did not include an official summary statement for the referendum, the Secretary of State was required by § 116.160.1 to prepare a summary statement of the measure and transmit it to the attorney general for approval as to the legal content and form of the statement.[6] Section 116.160.2 dictates that the summary statement submitted "shall contain no more than fifty words, excluding arti-

cles" and "shall be a true and impartial statement of the purposes of the proposed measure in language neither intentionally argumentative nor likely to create prejudice either for or against the proposed measure." The summary statement of Amendment 3, drafted by the Secretary of State and forwarded to the Attorney General on June 19, 2012, stated:

> Shall the Missouri Constitution be amended to change the current nonpartisan selection of supreme court and court of appeals judges to a process that gives the governor increased authority to:
>
> - appoint a majority of the Commission that selects these court nominees; and
>
> - appoint all lawyers to the Commission by removing the requirement that the governor's appointees be nonlawyers?

On June 29, 2012, the Attorney General approved the legal content and form of the summary statement. On July 3, 2012, the Secretary of State certified the official ballot title for Constitutional Amendment 3.

---

**4.** Amendment 3 provides that the four citizens selected by the Governor must consist of "one from each court of appeals district and one from the state at-large."

**5.** Amendment 3 goes on to set forth the term limits under which members selected to the judicial nonpartisan commissions will serve. The constitutional amendment provides that "[n]onvoting members shall be selected for terms of four years, with the first term beginning January 15, 2013." It further provides that:

> The terms of appointed members and of the supreme court judge member of the Appellate Judicial Commission serving on January 15, 2013, shall end on that day. The governor shall appoint two members to the commission for terms ending January 15, 2015, and appoint two members for terms

ending January 15, 2017. The terms of all subsequently appointed commission members shall end four years after the termination of the prior term. Vacancies occurring in unexpired terms shall be filled for the remainder of the unexpired term.

**6.** Section 116.160.1 provides that "[i]f the general assembly adopts a joint resolution proposing a constitutional amendment or a bill without an official summary statement, which is to be referred to a vote of the people, within twenty days after receipt of the resolution or bill, the secretary of state shall prepare and transmit to the attorney general a summary statement of the measure as the proposed summary statement." After the summary is transmitted to the attorney general, "[t]he attorney general shall within ten days approve the legal content and form of the proposed statement." § 116.160.1.

On July 13, 2012, under the authority of § 116.190, the Appellants filed a petition in the Circuit Court of Cole County, challenging the language of the official ballot title as insufficient and unfair and requesting a different summary statement. On September 7, 2012, after the parties filed cross-motions for judgment on the pleadings, the circuit court held a hearing.

On September 10, 2012, the circuit court entered its judgment in favor of the Secretary. After noting that there were no factual disputes and that the court was addressing cross-motions for judgment on the pleadings, the trial court concluded, in relevant part:

> There is no question that a better summary statement could have been submitted by the Defendant. However, that is not the test to be applied. Governing case law requires this Court to afford great deference to Defendant's summary statement, particularly when viewed through an aperture of no more than 50 words.
>
> Under this standard, the Court finds that Defendant's summary statement accurately reflects the legal and probable effects of the proposed amendment without bias, prejudice, deception or favoritism. The summary statement does not include all details or all possible outcomes, but including all details or all possible outcomes neither is required nor possible under the limits of § 116.160 RSMo. The summary statement does reflect the purposes of Amendment 3 in language that is neither intentionally argumentative nor likely to create prejudice either for or against the measure.
>
> The Court finds that the Defendant's summary statement complies with § 116.160 RSMo, as interpreted by the Missouri Supreme Court, [and] is suffi-

cient and fair as a matter of law. It does not require revision.

Appellants appeal from that judgment, claiming that the Secretary of State's summary was insufficient and unfair.

■ Appellants raised their challenge to the summary statement for Amendment 3 under § 116.190. Section 116.190 permits citizens to challenge a summary statement prepared by the Secretary on the ground that it is insufficient or unfair. *Bergman v. Mills,* 988 S.W.2d 84, 92 (Mo.App. W.D. 1999). "The burden is on the opponents of the language to show that the language was insufficient and unfair." *Id.*

■ "As in any court-tried matter, we will sustain the circuit court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Missouri Mun. League v. Carnahan,* 303 S.W.3d 573, 579 (Mo.App. W.D.2010). Where, as here, the parties simply argue the fairness and sufficiency of the summary statement based upon stipulated facts, joint exhibits, and undisputed facts, the only question on appeal is whether the trial court drew the proper legal conclusions, which we review *de novo. Id.* at 580.

■ For purposes of § 116.190, "[i]nsufficient means 'inadequate; especially lacking adequate power, capacity, or competence.' The word 'unfair' means to be 'marked by injustice, partiality, or deception.'" *Cures Without Cloning v. Pund,* 259 S.W.3d 76, 81 (Mo.App. W.D.2008) (quoting *Hancock v. Secretary of State,* 885 S.W.2d 42, 49 (Mo.App. W.D.1994)). "Thus, the words 'insufficient or unfair' ... mean to inadequately or with bias, prejudice, deception and/or favoritism state the consequences of the initiative." *Id.* at 81. " 'Fair' and 'sufficient' have been defined in a manner that gives dis-

cretion to [the Secretary.]" *Brown v. Carnahan*, 370 S.W.3d 637, 669 (Mo. banc 2012) (Fisher, J., concurring). "The language used should fairly and impartially summarize the purposes of the measure so that the voters will not be deceived or mislead." *Id.* at 654 (internal quotations omitted). "It should accurately reflect the legal and probable effects of the proposed [amendment]." *Id.*

■ In their sole point on appeal, Appellants contend that the circuit court erred in concluding that the summary statement was not insufficient or unfair. They contend that the summary is unfair and/or insufficient in that: 1) it fails to identify the primary legal effect of the proposed amendment, which is to reduce the influence of members of the bar on the Appellate Judicial Commission; 2) it suggests that the effect of the measure would be to increase the possible number of lawyers serving on the Commission while failing to mention that another effect of the measure is reducing the number of lawyers [7] that are required to serve as voting members of the Commission; and 3) it implies that the amendment would replace the nonpartisan court plan with a different process.[8]

The appellants contend that the primary legal change proposed by the amendment is to decrease the influence of the "Missouri Bar" [9] on judicial appointments and that the summary should have included language to that effect. Appellants conceded at oral argument that there is no legislative history for SJR 51 and that there is no way to discern the legislative intent behind approval of SJR 51. Appellants further concede that the Secretary could look only to Amendment 3 itself to ascertain its purpose and effect. Appellants, nonetheless, argue that the Secretary should have discerned their perception of the effect of the Amendment to be the primary legal effect. Perhaps the Secretary could have imagined that, but, as the Secretary points out, it cannot be said that such an effect is readily apparent upon reading the language of the amendment.

The proposed amendment would:

● Change the member of the Commission selected by the Supreme Court from a judge of that court to a retired judge, and make the Commissioner selected by the Supreme Court a nonvoting member of the Commission;

● Increase the number of commissioners appointed by the Governor from three to four, thus giving the Governor the

7. The assertion of appellants is that by removing the voting participation of a member of the Supreme Court, they are reducing the requirement that that there be voting participation by four "lawyers." In other words, the Appellants see the Supreme Court judge as a "lawyer," not as a member of the judiciary.

8. In their petition, the Appellants suggested a specific alternative summary statement is required by section 116.190. On appeal, they suggest a different specific alternative summary statement. In light of our holding, *infra*, we need not concern ourselves with any issues of preservation related to the specific proposal they now suggest.

9. The Missouri Bar has no direct role in the selection of judges under the existing nonpartisan court plan. The Missouri Bar does not endorse or recommend individuals to serve as commissioners or as nominees. Individual lawyers wishing to serve as commissioners stand for election among the lawyers residing in the respective three districts of the court of appeals, and are elected by the vote of all who choose to vote. Therefore, we assume when the Appellants refer to the "Missouri Bar" they mean members of The Missouri Bar (licensed lawyers), rather than the association as an entity.

authority to appoint the majority of the voting commissioners;

- Eliminate the requirement that commissioners appointed by the Governor not be members of the bar;
- Adjust the terms of appointed Commissioners so as to allow a Governor to appoint four commissioners within two years of taking office rather than one Commissioner every four years (three Commissioners for a two-term Governor); and
- Increase the number of applicants nominated by the Commission and submitted to Governor from three to four.

Because these proposed changes, in combination, increase the Governor's influence over the membership of the Commission and the selection of appellate judges, we cannot say that the Secretary's summary, which focuses on proposed increases to the Governor's authority, insufficiently or unfairly summarizes the purpose and effect of the proposed amendment.

Appellants argue that while expanding the authority of the Governor may be one effect of the proposed amendment, the Secretary's summary is insufficient and unfair in that if fails to identify another legal effect of the proposed amendment: to limit the influence of lawyers over the Appellate Judicial Commission by reducing the number of lawyers *required* to serve on the Commission from four to three. We cannot say that the summary is insufficient or unfair for failing to identify reducing the influence of lawyers as a legal effect of the amendment when the amendment increases the number of lawyers who may serve on the Commission from a maximum of four to a maximum of seven voting members. The proposed language adds an additional appointee of the Governor (lawyer or nonlawyer) to the Commission and takes away the vote of the member appointed by the judiciary to serve on the Commission. In this way, the proposed amendment shifts one vote from a commissioner appointed by members of the judicial branch (the Supreme Court) to a commissioner appointed by a member of the executive branch (the Governor).

"While there may be specific aspects of the ballot measure that [Appellants] would like to see included in the summary statement, their exclusion does not render the summary statement insufficient or unfair." *Coburn v. Mayer,* 368 S.W.3d 320, 326 (Mo.App. W.D.2012) (rejecting a challenge to the sufficiency and fairness of the summary statement for a proposed constitutional amendment concerning the freedom of religion although the summary did not mention that the amendment would create a new right for students to refrain from participating in assignments and educational presentations). Amendment 3 alters the makeup of the Commission so that *the majority* of the voting members of the nonpartisan judicial selection Commission are appointees of the Governor. While it does reduce the number of lawyers *required* to serve as voting members of the Commission, it also increases the number of lawyers who may serve as voting members of the Commission from four to seven. Thus, the Secretary's language, focusing as it does on the increase in the Governor's authority, cannot be deemed insufficient or unfair in failing to reference a reduction in the number of lawyers required to serve on the Commission.

■ Next Appellants challenge the language in the summary stating that the proposed changes to Article V would "give the governor increased authority to ... appoint all lawyers to the Commission by removing the requirement that the governor's appointees be nonlawyers" as setting forth a hypothetical scenario that they believe is unlikely to ever occur and is,

therefore, allegedly misleading. There is, however, nothing hypothetical about the language used. If adopted, the changes to Article V would have the effect, immediately upon their enactment, of removing the legal requirement that appointees of the Governor be nonattorneys, and it thereby authorizes the Governor to choose to appoint only lawyers to the Commission. We cannot conclude that the inclusion of this language renders the summary unfair or insufficient because the removal of the restriction requiring the Governor to appoint only nonlawyers to serve on the Commission is a significant change in the nonpartisan court plan.

Nonlawyers have been a part of the reform movement represented in the Missouri non-partisan plan from the start. This is seen in the movement for judicial reform in Missouri which began in the 1930's after progress had been made in providing for the discipline and removal of unqualified and unethical lawyers. Henry A. Bundschu, *The Missouri Non–Partisan Court Plan—Selection and Tenure of Judges*, 16 U. Kan. City L.Rev. 55, 57 (1947–48). As history records it:

> A group of leading St. Louis lawyers organized the *Missouri Institute for the Administration of Justice*, for the purpose of seeking ways and means of improving the administration of justice in Missouri. It was not a group whose membership was restricted to lawyers. There were 150 members of the Institute. Of these, one hundred were laymen and fifty were lawyers. On the Executive Committee which drafted the recommendations of the Institute, there were ten lawyers and five laymen.

> A committee of the St. Louis Bar Association presented a draft of a method for selecting judges, now referred to as the Missouri Plan, which was patterned after a plan recommended by the American Bar Association in 1937. The Institute adopted the draft as its own and prepared it in the form of a constitutional amendment. There are 114 counties in Missouri and a sub-committee was appointed for each county to procure the necessary signatures on initiative petitions for placing the plan on the ballots of the next election.

> At the general election in 1940, the Plan was adopted as an Amendment to the State Constitution, by a majority of 90,000 persons.

*Id.* at 57.

Since the inception of the nonpartisan court plan in 1940, the general public has been guaranteed that it will have a say in the selection of Supreme Court and court of appeals judges.[10] This was so because the Governor was prohibited from appointing lawyers to the Commission. Thus, the citizens of the State were assured that three members of the Commission would be nonlawyer members of the general public. Amendment 3 eliminates the guarantee of nonlawyer commission membership, and it permits the Governor to appoint lawyers to the Commission seats that were previously reserved exclusively for nonlawyer members of the general public. The Secretary reasonably could have found it significant that, after more than seventy years of mandated participation by nonlawyers in the nonpartisan judicial selection process, the amendment would relieve

10. When Missouri first became a state it employed a gubernatorial appointive system. Mo. Const. of 1820, Art. V, Sections 13–14. Missourians turned to popular election of all judges. Years later, a reform movement proposed the initiative petition that provided for what has become known as the Missouri Plan. *See* Joshua C. Hall & Russell S. Sobel, Show–Me Institute, Pol'y study No. 15 Is the 'Missouri Plan' Good for Missouri, Selection 4–5 (2008).

the Governor of the restriction that he or she must appoint nonlawyers to the Commission.

Appellants, nonetheless, argue that inclusion of the word "all" in the second bullet point renders the summary unfair. One option Appellants suggest is that we remove the word "all" from the Secretary's summary, so that it says that the proposal gives increased authority to the Governor to "appoint lawyers" to the Commission.

The question before us is whether that word "all" is significant enough for us to say that the trial court erred as a matter of law in upholding the Secretary's language. The question, of course, is not whether this is the best summary, but whether the summary gives the voter a sufficient idea of what the proposed amendment would accomplish, without language that is intentionally unfair or misleading. The idea is to advise the citizen what the proposal is about.[11] Whether the Secretary could have more artfully phrased the summary is a matter beyond the purview of this court in determining the fairness and sufficiency of a summary statement. In these circumstances, we cannot say that inclusion of the word "all" makes the summary unfair or insufficient.

As Appellants concede, the summary statement accurately states that Amendment 3 removes the requirement that the Governor's appointees be nonlawyers. Thus, such language in the summary statement fairly and sufficiently summarizes a legal effect of Amendment 3. But Appellants argue that if this legal consequence of the proposed amendment is included in the summary, the summary must also mention other legal consequences—specifically, the reduction in the number of lawyers required to serve on the Commission.

However, as previously stated, § 116.160.2 prohibits the Secretary's summary statement for constitutional amendments from containing more than fifty words, excluding articles. Missouri case law is clear that within the confines of those fifty words, the summary statement need not include every aspect or detail of the proposed measure. See *Missouri Municipal League*, 303 S.W.3d at 584. Furthermore, "[w]hile there may be aspects of the ballot initiative or consequences resulting therefrom that [opponents] would have liked to have seen included in the summary statement, their exclusion does not render the summary statement either insufficient or unfair." *Missourians Against Human Cloning v. Carnahan*, 190 S.W.3d 451, 457 (Mo.App. W.D.2006). Thus, "[t]he test is not whether increased specificity and accuracy would be preferable or provide the best summary." *Brown*, 370 S.W.3d at 656. Accordingly, the summary statement for Amendment 3 is not unfair or insufficient solely on the basis that it does not include every possible consequence of the amendment within the fifty-word summary.

■ Finally, Appellants assert that the summary statement is insufficient and unfair because it suggests to voters that Amendment 3 would replace the current nonpartisan court plan with a new "process" for selecting judges. More specifi-

---

11. The language stating that the governor would have increased authority to appoint "all lawyers" to the commission may seem to be couched in a way that might create special concern to voters who value the participation of non-lawyers on the commission. Perhaps it would invoke less concern if the Secretary had referred merely to the increased authority to "appoint lawyers," without the use of the word "all." But the challengers have not demonstrated that the "all lawyers" language was unfair in pointing out a potential significant impact of the measure, or that it is inaccurate or insufficient. Perhaps it would arguably be "better," but that is not the test.

cally, Appellants take issue with the following language: "Shall the Missouri Constitution be amended to *change the current nonpartisan selection* of supreme court and court of appeals judges *to a process* that gives the governor increased authority...." (Emphasis added). Appellants contend that this language is insufficient and unfair because Amendment 3 would not change the current nonpartisan method of selecting judges to a new process, as stated in the summary. Rather, Appellants argue that Amendment 3 would alter the nonpartisan court plan only by changing the composition of the Appellate Judicial Commission and increasing the number of nominees selected by the Commission.

Appellants claim that the current nonpartisan selection system will only be amended, not changed, to a new process. Appellants overlook the fact that when one amends something, it is necessarily changed. Amendment 3 would undeniably "change" the selection process for appellate judges. As previously discussed, the amendment will increase the size of the Appellate Judicial Commission to eight members, seven of which will be voting members. Of those seven voting members, four, instead of three under the current provision, will be selected by the Governor. The terms of the commission members appointed by the governor are also shortened. Thus, there is no question that the proposed constitutional amendment *changes the current judicial selection* process.

Moreover, to the extent that Appellants object to the language used in the summary statement, "[w]hether the summary statement prepared by the Secretary of State is the best language for describing the [amendment] is not the test." *Asher v. Carnahan*, 268 S.W.3d 427, 431 (Mo.App. W.D.2008) (internal quotation omitted).

Thus, it does not matter whether opponents of the summary statement are able to provide more specific or even more preferable language. *See Bergman*, 988 S.W.2d at 92. "[T]here are many appropriate and adequate ways of writing ... summary ballot language." *Asher*, 268 S.W.3d at 432. Indeed, "there is a wide range of acceptable ballot summaries for any particular proposed amendment to the constitution." *Id.* at 431. Therefore, the test for sufficiency and fairness remains "whether the language fairly and impartially summarizes the purposes of the [amendment]." *Id.*

Appellants focus on the Secretary's use of the words "change" and "process" to describe Amendment 3. They suggest that "[t]hough the 'current nonpartisan selection' system will be amended, it will *not* be changed 'to' a new process." The Secretary did not refer in her summary to a "new" process. Appellants' contentions amount to an argument that the Secretary could have provided more clarity by describing the intricacies of Amendment 3 within the context of the current nonpartisan court plan. If enacted, Amendment 3 will change the judicial selection process under the nonpartisan court plan. While Appellants believe the Secretary could have explained that more artfully, that is not the standard nor does it mean that the summary statement is unfair or partial in explaining the purpose of the amendment. The trial court expressed its opinion that the summary statement could be "better," but went on to recognize that different people would have different views about what might make it better. Thus, the test is whether it is unfair or insufficient. § 116.190.

For the foregoing reasons, we conclude that the Secretary's summary statement is neither unfair nor insufficient. Nevertheless, there is one further matter that we

must address. The trial court's judgment merely states that "[t]he matter is dismissed in the Defendant's favor with prejudice." Section 116.190.4 RSMo Cum. Supp. 2009, however, requires the court, in its decision, to "certify the summary statement portion of the official ballot title to the secretary of state." The trial court's judgment failed to comply with this requirement.

Pursuant to Rule 84.14, this Court has the authority to enter the judgment that the trial court should have entered. Accordingly, we amend the trial court's judgment to certify the summary statement portion of the ballot title to the Secretary of State. As so modified, the judgment is affirmed.

MITCHELL, J., concurs.

SMART, J., concurs in separate opinion filed.

JAMES M. SMART, JR., Judge, concurring.

I concur in the opinion of the court that the summary language is neither unfair nor insufficient. I write separately simply to add some additional thoughts that help explain the factors that persuaded me that the phrase "appoint all lawyers to the Commission by removing the requirement that the governor's appointees be nonlawyers" does not fall short of being a legally proper and sufficient summary of this measure.

Upon initial consideration, the argument of Appellants that this language is unfair or intentionally argumentative has an air of plausibility. The Appellants say the language of the summary *assumes* that the Governor may be inclined to entirely or largely abandon the traditional (and currently mandatory) inclusion of nonlawyer citizens in the judicial selection process. The Appellants say that such a scenario is merely a possibility that should not be given the play that it receives. Appellants are concerned that voters might not be highly favorable to a commission that is composed entirely of lawyers. So, one wonders, is the Secretary's ballot summary unfairly emphasizing the possibility that nonlawyer participation in judicial selection might be abandoned?

The majority opinion demonstrates the significance to the non-partisan court plan of maintaining nonlawyer citizen participation in the nomination process. Moreover, in reflecting on the history and design of the court plan, we note that the Secretary, in attempting to draft the summary within the strict word limit permitted, was faced with the fact that the drafters of Amendment 3 deliberately removed the explicit restriction *against* the Governor appointing only lawyers, thereby intentionally diluting if not entirely removing participation by nonlawyer citizens. In view of the fact that there is no obvious reason (at least none is obvious to me) to remove the requirement of non-lawyer participation, and in view of the fact that lawyers were already guaranteed three seats on the Commission without the Governor's appointments, it becomes possible under Amendment 3 that all seven voting members of the Commission will be lawyers.

The Missouri Non–Partisan Court Plan was an effort to provide "checks and balances" in the process of judicial selection. The Missouri Institute for the Administration of Justice regarded the mandatory participation of nonlawyer citizens as a significant part of the checks and balances that it sought to introduce by implementing this plan. *See* Ronald J. Foulis, *The Missouri Non–Partisan Court Plan Adopted,* 27 ABA Journal 9 (Jan. 1941). A campaign leaflet describing the plan stated, among other things, that the plan con-

tains "checks and balances," is not "an outright appointive system," and "does not destroy the right of the people to have a voice in the selection of judges." *Id.* at 10.

The plan included participation by the Governor in naming nonlawyer citizen members to the Commission, and then making the final selection from among the Commission's nominees. The members of the bar participate by electing three lawyer commissioners, and the general citizenry participates through its nonlawyer commissioners appointed by the Governor, and by voting in retention elections. The judicial branch participates through the judicial commissioner. The evident assumption of the plan is that each entity represents *different* interests and perspectives. The lawyers' interests in the judiciary do not necessarily entirely overlap with those of the general citizenry, and the interests of the judicial branch represented by the judicial commissioner do not necessarily overlap with those of the other commissioners. The Governor, of course, exercises the final say in selecting from among the nominees, but the Governor's role has been significantly limited to the final stage of the selection process.

The Appellants seem to believe that the Secretary should have assumed that the Governor would have largely retained the practice of appointing nonlawyers as commissioners to offset the influence of the three practicing lawyers on the Commission. The problem is that such an assumption would entirely lack foundation. Yet they recognize that the language of Amendment 3 removing the mandate for nonlawyer participation was *not* inadvertent. The proposed change is deliberate. And the proposed change is absolute. The Appellants do not explain why it is absolute. The proposed amendment does not merely authorize the Governor to appoint one or two more lawyers out of the four appointments; it authorizes the governor

to appoint four, which would result in a voting membership composed entirely of lawyers. Because one can discern on reflection that this is a very significant change to the plan, the Secretary could reasonably believe that it should be addressed in the summary as a significant change.

Appellants' view that other portions of the amendment might be more significant may differ from that of those who promoted the non-partisan plan in the first place, as noted above. While the Secretary chose this method (using the language "appoint all lawyers") to emphasize that under Amendment 3 we may see the demise of nonlawyer citizen involvement as we know it, it is difficult to discern how (within the word limitations faced by the Secretary) this point of the measure could have been made more clear to the voters.

If the Secretary had removed the word "all" it would have informed the voter that the proposal would increase the authority of the governor to "appoint lawyers to the commission" by removing the requirement "that the governor's appointees be nonlawyers." While that would also presumably have been acceptable wording, it would have indicated something slightly different from what the summary actually expresses. It might, in fact, have caused confusion to a voter unfamiliar with the current make-up of the Commission, who may wonder if the Commission currently is composed *solely* of nonlawyer citizens, and that the General Assembly has decided for some reason that it is time to allow some lawyers to participate. Those who believe in the value of a system of checks and balances might therefore believe the amendment would actually work in reverse of the way that it does as far as the lawyer/nonlawyer divide.

Unfortunately, within the statutory word limitations of the summary, the Secretary lacks the capacity to advise the electorate

within the summary how many persons are now serving or would be serving on the Commission (and who it is that puts them on the Commission, and who they represent) and what the effect of passage of the amendment would be. While the language before us is not perfect, it does inform the electorate, as the majority also notes, that this amendment would increase the governor's authority to appoint a majority of commissioners, and that by entirely removing the requirement that the governor appoint only nonlawyers, nonlawyers will no longer be guaranteed representation on the Commission. Some governors may in fact prefer lawyers as commissioners. Evidently the drafters of Amendment 3 thought so.

Considering all of the foregoing, and considering that the summaries proposed by the Appellants would entirely fail to inform the electorate that this amendment would bring about a significant increase in the authority of the governor in the judicial selection process, I agree that the Appellants have not met their burden of showing that the summary statement is insufficient or unfair.